## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **BRIAN W. EUKEL and** | § | |
| **THERESE L. EUKEL,** | § | |
| *Plaintiffs,* | § | |
| | § | **CA NO. 4:14-cv-2385** |
| **VS.** | § | ------------------------------------- |
| | § | **JURY DEMANDED** |
| | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| *Defendant.* | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiffs Brian and Therese Eukel ("the Eukels"), bring this suit, claiming that Defendant HARRIS COUNTY, ("the County"), acting under color of state law, deprived the Eukels of their rights under the United States Constitution, and show the Court as follows:

### PRELIMINARY STATEMENT

1.        On an evening in early December, 2013, Harris County Commissioner Steve Raddack left a voice message at the Eukel home, demanding a return call first thing in the morning.  In the consequent communication, the Commissioner accused Brian Eukel of cutting down three trees and failing to clear a pile of brush from behind his property abutting the Buffalo Bayou right of way in west Houston.  The Commissioner promised criminal prosecution.  He gave no opportunity for Mr. Eukel to provide the legitimate and reasonable explanation for his action in removing the trees: they were non-native fruit trees planted by his neighbor, they had outlived their life expectancy by years, were diseased (dying limb by limb), and not cutting down the trees would risk spreading the disease to surrounding vegetation.

2.        Commissioner Raddack's call was followed with a nightmare of scrutiny by multiple County departments and agencies, with multiple allegations; followed by daily threats, bullying and harassment that continued for nearly two months.  For instance, in complying with the County's

demands, the Eukels were forced to scrape two to five inches of dirt off the slope behind their home and otherwise destroy the beauty they had worked so hard to create. There was no explanation why the Eukels had been singled out for this treatment since other neighbors had also left piles of brush behind their homes and had also cut down trees.  Nevertheless, as good citizens, the shocked and stunned Eukels complied as best they could with the relentless, hassling, vague and ever-shifting demands of the County  –  ultimately at great cost to their finances and health.  The County's and Commissioner Raddack's abuse of power shocks the conscience and demands account.

3.      This is a proceeding for declaratory judgment, damages, compensatory damages, attorneys fees and other relief to secure the Eukels' rights.  It is brought to prevent Harris County from maintaining a custom, practice and policy of discriminating against the Eukels (as a class of one) and to ensure that all County officials be reminded of the importance of respecting the rights and privileges of its citizens.

## JURISDICTION AND VENUE

4.      This case is brought under 42 U.S.C. §1983, asserting violations by Harris County of the Eukels' procedural due process and equal protection rights provided under the Fourteenth Amendment of the United States Constitution.

5.      The court has jurisdiction over these claims pursuant to 28 U.S.C.§1331.

6.      Venue in this Court is appropriate pursuant to 28 U.S.C. §1391, because the parties reside or exist within the Houston Division of the Southern District of the State of Texas and actions involved in this dispute occurred within its jurisdiction.

## PARTIES

7.      Plaintiff, Brian Eukel, has been a resident of Harris County, Texas, within the jurisdiction of the Southern District of Texas, at all times relevant to this action.

8.     Plaintiff, Therese Eukel, has been a resident of Harris County, Texas, within the jurisdiction of the Southern District of Texas, at all times relevant to this action.

9.     Harris County is a local government in the State of Texas and may be served by delivering a copy of the summons and complaint to the County Judge, Ed Emmett, at 1001 Preston Ave., Houston, Texas 77002.  The County is liable for its constitutional violations as described herein.

## CONDITIONS PRECEDENT AND NOTICE PROVISIONS

10.     All conditions precedent to filing this suit have been accomplished. Pursuant to Local Government Code §89.004, the Eukels presented Harris County with their claims on February 14, 2014, by hand-delivering a  lengthy letter to County Judge Ed Emmett which explained in great detail, the conduct by which they incurred significant damages. A compromise demand for compensation was included.  The letter was also hand-delivered to County Attorney Vince Ryan.

11.     More than sixty days have passed since the presentation of these claims and the County has not paid all or a part of the claim.  To the contrary, despite having been shown proof that the trees were dead and/or dying, the County has repeated a demand for thousands of dollars to compensate the County for those trees.

## FACTUAL BACKGROUND AND BASIS FOR COMPLAINT

12.     The Eukel family (Brian, Therese and two children Alex and Phillip), moved into the house on Bramblewood Drive, in November, 1991.  The home backs up to an easement that runs along Buffalo Bayou in west Houston.  The easement is owned by the Harris County Flood Control District ("HCFCD") and administrated by the City of Houston.

13.     As with many of the bayous in Harris County, vegetation grows wild and the area is replete with wild life including coyotes, birds, snakes, rabbits, armadillos, the occasional alligator,

and other creatures native and non-native to the region.  A cattle trail dating to the days when the land was occupied by farmers and ranchers ran the length of the bayou in this part of the county and residents living nearby would use the path for recreation.

14.     The Eukels and others living along the bayou voluntarily bear what they perceive as their civic responsibility to act as guardians and stewards of the nature they understand they are privileged to reside near. These people (past and present neighbors) planted most of the trees that contribute to the beauty of what is now Terry Hershey Park.  They plant, prune, water, mulch, and generally care for the vegetation.  Residents have dragged hoses and carried buckets of water to trees throughout periods of drought.

15.     As part of this stewardship, the Eukels and several other neighbors started a wild flower garden in the easement by scattering seeds in a circular area approximately 20 feet in diameter.  The area was enjoyed by visitors to the park, including children from a nearby elementary school.  It was a favorite  background for family photographs.  Mr. Eukel also planted twenty-five (25) trees and an additional twenty-five (25) bushes which provide shade and enjoyment to visitors as well as habitat and food for wild animals.

16.     Recognizing its beauty and potential as a public park, by the mid 1990s Commissioner Raddack had begun to realize his dreams and plans to add this area to the already established Terry Hershey Park to the east of Eldridge Road.  The cattle trail was soon established as an asphalt hike and bike trail, more trees were planted, and the County took over many aspects of caring for the easement.

17.     The County began trucking in water for trees though neighbors continued supplementing in times of drought.  The County's watering efforts included some, but not all of the trees and bushes planted by Mr. Eukel.  The Eukels watered these trees at their own expense.

18.     Some homeowners mow large areas of grass even though the County's tractor mowers now cover most of the easement.  Sadly, this meant mowing down the wildflower garden as well.

19.     To protect the wildflower reserve, Mr. Eukel placed small posts approximately 12" high at approximately 8 foot intervals around its circumference.  These posts were deliberately not set in concrete but rather placed loosely in the ground so as to be easy to move or remove.  The wild flowers once again thrived though resentment was noted amongst the mower crews.  A lawn mowing employee of the County rammed a Magnolia tree that had been planted by The Park People[1] in the right of way on behalf of a family residing in the area.  Ten years later, that tree continues to tilt at a 15 degree angle.

20.     In the twenty plus years that the County has cared for the easement as a park, it has never provided formal notice of rules, ordinances, or policies impacting the area to neighbors whose homes back to the right of way.

### EVENTS LEADING UP TO THE COMMISSIONER'S CALL

21.     In the Spring of 2013, Brian Eukel had undertaken to clean out the weeds, vines, and growth that was overtaking the grove of trees the previous owner of their home had planted at the bottom of the slope behind his property. He hired a crew to assist at his own expense. After Mr. Eukel's work, the grove was beautifully manicured and the rose bushes he had planted there years earlier were better presented. The removed brush, dead branches, twigs, weeds, vines, and other growth ("the brush pile") were  placed in a pile at the edge of the easement.

22.     In June, 2013, a David Tamborella with Harris County (he did not identify the department or his position) came to the Eukel's home and asked that Mr. Eukel remove the brush

---

[1]  The Park People is a local non-profit encouraging tree planting throughout Harris County.

pile behind his home. Mr. Tamborella explained that the brush pile was considered "unsightly" by the County but he was otherwise complimented for his beautification of the area.

23.      Mr. Tamborella and Mr. Eukel also discussed a wall that Mr. Eukel built using concrete blocks from a patio that neighbors had torn out some months earlier.  Attached as **Exhibit A** is a picture of the wall. The neighbors had been concerned about having to haul it all away so Mr. Eukel offered to help them out by arranging the broken up concrete along the bottom of the slope behind his home. Some fill had also been added behind the wall to move the slope to the top of the 2 to 3 foot wall. This is not unlike other structures neighbors have constructed in the right of way as a means of protecting vegetation or erosion.  Mr. Tamborella inspected this structure and told Mr. Eukel that the County did not have any issues with the wall.  He was just to remove the brush pile.

24.      There are a number of such brush piles behind the other homes backing to the easement on the north side of Buffalo Bayou between Eldridge Road and Dairy Ashford Road, placed there by neighbors who had engaged in the same type of beautification projects as the Eukels.

25.      The Eukels assumed that everyone had received the same request from Mr. Tamborella to clean up the areas behind their homes.

26.      Brian Eukel is currently building a software start-up company and works seven (7) days per week devoting virtually all his time to its survival and success.

27.      It was also in part because none of his neighbors had begun removing their piles that Mr. Eukel allowed such a long passage of time before tending to the removal.

28.      The second communication about the brush pile occurred near Thanksgiving, 2013, when Sergeant Gary Latham of Harris County's Environmental Crimes Unit left his card on the Eukel's front door with the writing, "Case #5488-3-C."

29.     Therese Eukel called Sergeant Latham and learned that the case related to the brush pile and was kindly reminded to remove it.

30.     Mrs. Eukel apologized and made arrangements to rent a wood chipper.  Over the Christmas holidays, they made a project of cleaning up the entire area.

31.     In the course of that project, Mr. Eukel discovered that three trees planted by his former neighbor (a Bartlett Pear, Sam Houston Peach, and a Calimyrna Fig), were diseased and dropping large limbs riddled with bugs.

32.     The branches that had fallen were at least as ugly as the brush pile the Eukels had been asked to clean up.  Mr. Eukel, extremely knowledgeable about his arborist hobby, cut down the diseased and dying trees to protect the surrounding vegetation from becoming diseased.  Safety of park visitors who sit beneath the trees was also a consideration.   The area was frequented by park users who would picnic at a table Mr. Eukel had placed in the shade of the grove of trees.

33.     As is his habit and out of respect for nature, Mr. Eukel planted six young and healthy fruit trees as a replacement for the three he had cut down.

34.     Within days, Brian Eukel received the call from Commissioner Raddack.

**THE COUNTY WIELDS ITS FRIGHTENING POWER AGAINST BRIAN AND THERESE EUKEL**

35.     On or about the early evening of Wednesday, December 4, 2013, Brian Eukel returned home from work to a voice mail message from Commissioner Steven Raddack, angrily demanding a return call.

36.     Before Mr. Eukel had a chance to comply, Commissioner Raddack called again at 8:00am the next day.   Mr. Eukel was subjected to a raging barrage of accusations by the Commissioner that Mr. Eukel had cut down three trees in the right of way and that he had failed to

remove the pile of branches, vines, and other brush debris.  The Commissioner also accused the
Eukels of having been warned multiple times.

37.     He would not allow Mr. Eukel to explain and hung up the phone angrily with
repeated threats of criminal prosecution to "kick it up a notch."

38.     The three trees were non-native fruit trees that had been planted by the Eukel's
neighbor and all three were diseased (partially dead) having already outlived their life expectancy.

39.     With regard to the brush pile, they had only been asked twice before and they had
observed that no one else who lived along the bayou had removed *their* brush piles.

40.     Now terrified, Mr. Eukel retained counsel; not to fight back but rather facilitate
whatever the County needed to be done in order to appease Commissioner Raddack's anger and
avoid criminal prosecution.

41.     A conviction of even a misdemeanor could threaten the viability of his fledgling
business.  Mr. Eukel actually believed, but did not share with his attorney, that he believed he could
lose his home.  He took time away from his business to clear the brush pile using the wood chipper.

42.     No fewer than four Assistant County Attorneys as well as other officials joined in the
campaign of harassment against the Eukels.

43.     About the same time the brush pile was cleared, the Eukels began to notice multiple
white County pickup trucks driving slowly behind their home.  Small groups of men would emerge
and huddle, pointing at the slope behind their home, and appearing to discuss something very
seriously.  Next came teams of surveyors who set up flags and markers just behind their yard.

### SHIFTING DEMANDS FOLLOWING COMMISSIONER RADDACK'S CALL

44.     Philip Schuster, of the City of Houston (which administrates the right of way for the
Harris County Flood Control District) arrived at the front door of the Eukel home on January 6,

2014, and wrote up a Notice of Violation for Mrs. Eukel who stood speechless on her door step.

45.     Upon information and belief, apparently because the land behind the Eukel home extends out further than their neighbors on either side before dropping into a slope (but not as far as others similarly situated further along the right of way), County officials suspected the Eukels of having hauled in very large amounts of fill to alter the contours of the land.  This is simply not so. The contours along the right of way were created by the subdivision's developer when dozers leveled the land for construction in 1967.

46.     The Eukels offered pictures they had taken establishing the historical contours but the County, again, did not want to be confused by facts.

47.     Brian Eukel was not home when the City inspector, Mr. Schuster, visited his home, but the inspection proceeded with Therese Eukel.

48.     Mr. Schuster could not be specific about what needed to be done but was clear that much more than removing the recently built wall and fill behind it was required. He offered to send a map of the 2002 flood plain.  The Eukels waited patiently for that document but never received it. At one point they were told to look at a website showing elevations.  The map on the website does not have sufficient detail to distinguish the slope.

49.     The accepted practice when slope modification is required by a government agency is to have the slope survey and markers placed at various points indicating the increase or decrease of depth of soil required at that point.  This was never done.  Further, since the time frame for complying was so short, the Eukels were unable to request a survey to clarify how much soil was to be removed.  For all they knew, the County  wanted the Eukels to return the land to a contour that existed prior to the subdivision's construction in the mid-sixties.

50.     Counsel for the Eukels repeatedly sought clarification regarding what needed to be done to meet the County's demands.  The only response was a promise of a "demand letter" that would delivered shortly.

51.     On January 16, 2014, the demand letter was delivered stating that the Eukels had illegally removed several trees and had placed encroachments on its property, converting it to their personal use, inconsistent with the land's purpose. In addition to removing all encroachments, the County demanded $18,700 as the replacement cost for the three trees.  If all encroachments were not removed in seven (7) days, HCFCD would effect that removal and the Eukels would be charged for reimbursing the County all restoration costs.

52.     The Eukels considered the valuation of three near death fruit trees that had outlived their life expectancy at $18,700, and imagined what the County would charge for removing some undetermined amount of land behind their home.

53.     The Eukels were now terrified.  Mr. Eukel was forced to seek medical care.

54.     Therese and Brian Eukel immediately undertook to remove the picnic table that had been enjoyed by park visitors for years.

55.     In addition, Brian Eukel removed the posts protecting the wild flowers from County tractor mowers.

56.     A crew was hired by the Eukels at their expense and the Eukels took time away from their business to supervise the deconstruction of the tastefully built wall and watched as their driveway became obstructed by the pile of broken up concrete.  The small amount of dirt that was placed behind the top row of concrete of the wall was moved to their backyard.

57.     Had they had more time they could have avoided the cost of a crew and Brian Eukel would have done the work himself.

## The County Demands "More Fill" be Removed

58.    Upon completing what they believed to be a full response to the County's demands, the Eukels requested  an inspection take place prior to the deadline of Thursday, January 23rd.

59.    Since the Eukels had no specific guidance, in light of the uncertain and shifting demands, they wanted to be certain they had addressed all requirements.

60.    The inspection took place Tuesday, January 21st. The HCFCD official eyeballed the slope from a distance and commented that it was the consensus of other members of the department that deep gullies between existing trees that lined the top of the slope would be needed to push the slope back to be even with their neighbors.

61.    The official was informed that the trees had been planted by the County in 1995 as reparation for cutting down twelve (12) giant pine trees because of amended power line clearance regulations. Harris County obviously had knowledge of the elevation of the land behind the Eukel property and had never raised objections, concerns, or even a comment for at least eighteen (18) years.

62.    It was clear that the County wanted significant and expensive alterations to the contours of the land that did not comport with photographic proof of the historical contours the Eukels had offered.

63.    Continuing on without the benefit of the 2002 Flood Plain map that Mr. Schuster had promised them, the Eukels struggled to understand the County's demands.  They then recalled that on first moving into the home in 1991, twenty-three years (23) earlier, a contractor had been hired to perform drainage work in the back yard, which had involved excavating a large amount of dirt. Upon completion of that work, the contractor had simply pushed that dirt back over the slope behind the property.  This, the Eukels guessed, might be what the County believed was the encroachment.

64.     Persisting in their preferred posture of appeasing their Commissioner, who they had been told was continuing to direct all of the officials, and frustrated by still having no clear standards for compliance, on Wednesday, January 22nd, the Eukels earnestly undertook to determine exactly where the dirt the contractors had spread over the easement twenty-three (23) years earlier was located. To accomplish this, Mr. Eukel dug several cuts into the side of the slope to expose a very clear line where the soil had changed color and type. Another crew was hired by the Eukels at additional expense, in the short amount of time they had left, to shave off that layer of the land.

65.     At the top of the slope, the amount of dirt raised the surface by 2 inches and at the bottom of the slope, the land was raised by 4 to 5 inches. All of this dirt, including the sod that Mr. Eukel had nurtured into a beautiful carpet of grass, was removed to the growing pile obscuring his backyard. **Exhibit B** depicts the area after the wall and sod had been removed.

66.     Inspectors visited the site on a couple of occasions and came to finally understand that their initial opinion of the land's contours was inaccurate.

67.     Before the Thursday deadline arrived, the Eukels were told that a Harris County crew had been arranged to arrive at their home the next week to begin the excavation project that would return the land to its alleged "original contours."

68.     The County had not believed that the Eukels could establish compliance with their ever shifting demands.

69.     Nonetheless, Inspector Schuster and the Harris County Flood Control District official approved the work that had been done. The County's attorneys begrudgingly allowed that "most" of the fill had been removed so that matter, at least, was resolved.

### The County Then Demands "Tree Stump" Removal

70.     Having resolved the fill issue, the Eukels believed they were done. After yet another inspection by another County official (this time believed to be associated with Terry Hershey Park), another demand was made to remove stumps.

71.     The Eukels were told that if they did not remove the stumps the County would,  and again, charge them for labor costs.  After the inflated charge for tree reparation, the Eukels immediately removed the stumps at their expense before a quote could be obtained from the County.

### COMMISSIONER RADDACK IS THE FINAL POLICY-MAKER

72.     Commissioner Steve Raddack is the final policymaker, cloaked with final decision-making power concerning enforcement of rules and regulations within his precinct of Harris County. At all times relevant to this case, Commissioner Raddack was the decision-maker with regard to treatment of the Eukels, while acting under color of state law.

73.     Upon information and belief, Commissioner Raddack caused the various departments of Harris County to single out and target the Eukels (but no other residents along the bayou who had engaged in the very same conduct) for various enforcement actions.

74.     These actions under the direction of Commissioner Raddack, therefore form an official policy of the County.

75.     The County failed to provide adequate notice and process by which the Eukels could protect their rights and present their side of the story with compelling information establishing a lack of basis for enforcing alleged rules and regulations.

76.     This lack of notice caused the Eukels to resort to hasty compliance with vague and inadequately specific directives (constantly shifting) at great cost to them.  Such action violates the Eukels' Fourteenth Amendment protections.

## FIRST CLAIM FOR RELIEF: VIOLATION OF RIGHTS TO
## EQUAL PROTECTION UNDER FOURTEENTH AMENDMENT

77.     It is unlawful for a county to single out one individual and target him or her with unsupported demands for action in enforcing unidentified rules that they do not enforce against others similarly situated.

78.     The Eukels were intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment.

79.     The Eukels assert that those neighbors whose homes back to the right of way between Eldridge Road and Dairy Ashford Road on the north side of Buffalo Bayou are similarly situated. Based on the conduct of the County in demanding $18,700 for dead/diseased/dying trees and the total lack of specificity as to what they wanted or required, the motive was a bad faith intent to injure them.

80.     Harris County required the Eukels to remove a brush pile from the right of way that they had cleared from a grove of trees below their property.  Attached as **Exhibit C** are photographs of brush piles placed in the right of way by neighbors who had cleared groves of trees below their property; also on the County's right of way.   Based on information and belief (those piles still remain to this date) the County treated the Eukels differently without rational  basis other than a wholly illegitimate motive.  The County ignored neighbors' violations of the same rule(s), within sight of the Eukels property, and intentionally discriminated against them.

81.     Harris County also required the removal of the wall at the bottom of the slope as well as a layer of earth and turf that raised the level of the land 2 inches to 5 inches.   The posts protecting the wildflower reserve also had to be removed. Because the motives of the County were disguised,

Plaintiffs will have to engage discovery to ascertain what formed the basis of the irrational, arbitrary, and vindictive conduct.

82.     One possible motive, as petty as it may be, is that the Eukels were attacked because they created an impediment to easy mowing of the wild flowers by placing the poles in the ground surrounding the wildflower reserve.   Attached as **Exhibit D** are permanent structures that neighbors have constructed or established in the Harris County right of way which are also impediments to mowing. Many of them have a direct impact on the drainage and flood control concerns of the HCFCD.  Based on information and belief (those structures still remain to this date), the County treated the Eukels differently without rational basis other than a wholly illegitimate motive.  The County ignored neighbors' violations of the same rule(s) within sight of the Eukels property and intentionally discriminated against them.

83.     Harris County required the Eukels to remove the stumps of the fruit trees that Mr. Eukel had been cleared.  There are many stumps of trees in the right of way that neighbors had cut down but which the County had not required them to remove.  Pictures of some of those are included in **Exhibit E**.  Based upon information and belief (those stumps still remain to this date) the County treated the Eukels differently without rational basis other than a wholly illegitimate motive.  The County ignored neighbors' violations of the same rule(s) within sight of the Eukels property and intentionally discriminated against them.

84.     Harris County further required the Eukels to remove the picnic bench they had placed under the grove of trees and which was used and enjoyed by countless visitors to the park.  Attached as **Exhibit F** are temporary structures that neighbors have strewn behind their homes on the County's right of way that are at least as allegedly "unsightly" as the picnic table, brush pile and wall. Based

on information and belief (those items still remain to this date) the County treated the Eukels differently without rational basis other than a wholly illegitimate motive. The County ignored the neighbors' violations of the same rule(s) within sight of the Eukels property and intentionally discriminated against them.

85.     Commissioner Raddack marshaled no fewer than four departments of County government to target the Eukels with demands: 1) Terry Hershey Park, 2) Harris County Flood Control District, 3) County Attorney's Office, and 4) the City of Houston (the administrator of the HCFCD's right of ways).

86.     Apart from the angry tone Commissioner Raddack unleashed on the Eukels, this level of attention clearly evidences vindictive action, illegitimate animus or ill will.

87.     Illegitimate basis and animus is also shown by the County's demand of $18,700 for replacement of the three diseased and dying fruit trees.  It is arguable that the replacement value of dead or diseased trees is $0.  Nevertheless, if there is an ordinance or other regulation or rule of law that prohibits the cutting down of vegetation, the condition of the trees (diseased and dying or even dead) mitigates the offense to a minor level; not meriting the kind of overreaction observed in this instance.

88.     The Eukels sought the opinion of an expert who declared that all three trees could be replaced with healthy younger trees for less than $1,000.  A multiple of more than 18 in the County's demand for payment displays vindictive motive and, had the County attempted collection, would constitute an excessive fine that shocks the conscience of mankind and is actionable under the Texas Constitution.

## SECOND CLAIM FOR RELIEF: VIOLATION OF RIGHTS TO PROCEDURAL DUE PROCESS UNDER FOURTEENTH AMENDMENT

89.     The Eukels were scrutinized, wrongly accused of certain activities and vaguely accused of others, fined an exorbitant amount for the clearing of three dying/diseased trees, and then formally threatened with additional fines if not in compliance with ambiguously described standards; all to be resolved within an extraordinarily short period of time: seven (7) days.

90.     The Eukels were not provided adequate notice of the violations they were charged with; either by description or citation to legislation, ordinance or regulation.

91.     The Eukels were not provided an opportunity to respond in a meaningful manner or in a legitimate forum.  Commissioner Raddack hung up on Mr. Eukel, dismissing and ignoring his pleas to the reasonableness of his actions.  The posture of the Commissioner was clear: Don't confuse me with the facts, my mind is made up. The anguish suffered by the Eukels because of that single bullying call cannot be exaggerated.

92.     County officials engaged with the Eukels only by directing them to accomplish seemingly impossible alterations to land behind their home or face what would doubtless have been a large bill to pay for the County's resources to do the same.  The communication was one way.  No one was listening to the Eukels.

93.     Commissioner Raddack and other County officials ignored exculpatory evidence and continued to make demands of the Eukels without providing a meaningful opportunity to rebut the charges and accusations against them.  Without that meaningful opportunity to be heard, the Eukels were harassed and bullied into trying to leap the high hurdles thrown in front of them by the County.

94.     In sum, the total lack of specificity with regard to the offenses alleged and the impossibly short time limit to address the County's demands (seven days) violated the Eukels rights to due process.

95.     In their attempts to meet those demands within seven days because the County pressed on ignoring their cries for the officials to slow down and listen to them, the Eukels spent their money on efforts that would never have been compelled by fair application of law.

96.     The complete unwillingness to engage in rational and meaningful dialogue to discern the facts was not only frustrating, it caused the Eukels to rush into efforts to accede to the County's wishes that was financially costly.  Causing the Eukels to waste their money on what would have amounted to an entirely new flood control project constitutes a deprivation of property under the United States Constitution.

97.     Causing the Eukels to hastily remove the wall and dirt into their own backyard and driveway deprived them of the use and enjoyment of that property and destroyed the aesthetic beauty of nature that they had once so proudly nurtured.

98.     Both Therese Eukel and Brian Eukel endured extreme emotional distress and mental anguish.

## **DAMAGES AND RELIEF**

99.     Each of the preceding paragraphs is incorporated herein as if reproduced in full.

100.     The Eukels seek compensation of the sums spent in acceding to the irrational, arbitrary and unreasonable demands of Harris County in shaving off between 2 to 5 inches of dirt behind their home as well as every other required action.

101.    In addition, they seek compensatory damages for physical pain and suffering, mental anguish, shame, embarrassment, loss of reputation and humiliation; and all other damages and relief allowed by law.

102.    The Eukels seek pre- and post-judgment interest as allowed by law.

## JURY DEMAND

103.    Plaintiff hereby demands a jury on all claims triable by jury.

## ATTORNEY'S FEES

104.    Plaintiff hereby demands recovery of all reasonably necessary attorney's fees incurred in the prosecution of this matter.

## PRAYER

WHEREFORE, Plaintiff prays that this Court advance this case on the docket, order a speedy trial at the earliest possible date, cause this action in every way to be expedited, and upon such hearing:

a.      grant a declaration that Plaintiff's rights under the United States Constitution were violated;

b.      render judgment in their favor for Harris County's violation of their rights;

c.      find that Defendant is liable to Plaintiffs for the causes of action specifically alleged against the Defendant;

d.      grant Plaintiffs' relief for the causes of action alleged;

e.      grant Plaintiffs compensatory damages for physical pain and suffering, mental anguish, shame, embarrassment, humiliation; and all other damages allowed by law;

f.      grant injunctive relief requiring attorneys within the Harris County Attorneys' Office to receive State Bar approved continuing legal education on civil rights every calendar year, the number of hours to be determined by the Court;

g.      grant injunctive relief requiring all Harris County Commissioners and County Judge to receive continuing legal education on civil rights every calendar year, the number of hours to be determined by the Court;

h.      award Plaintiffs costs, expert fees, and attorney's fees against Defendant incurred in obtaining relief and pursing this action;

i.      award Plaintiffs pre-judgment and post-judgment interest against Defendant; and

j.      award Plaintiffs such other and further relief to which Plaintiffs may be justly entitled.

Dated: August 19, 2014.

                                Respectfully submitted,

                                __/s/ Jacqueline A. Armstrong_____
                                Jacqueline A. Armstrong
                                SDTX Admission No. 10740
                                TBA 01329990
                                440 Louisiana, Suite 900
                                Houston, TX 77002
                                Tel:  713.275.2181
                                Fax: 713.255.3075
                                E-mail: jarmstrong@armstrongatlaw.com

                                ATTORNEY IN CHARGE FOR PLAINTIFF


                        **CERTIFICATE OF FILING AND SERVICE**

        I hereby certify that on August 19, 2014, I electronically filed Plaintiff's Original Complaint using the Court's ECF system and served Harris County by mailing a copy of the Complaint by *Certified Mail 7005 2570 0001 0915 1858* and *7005 2570 0001 0915 2466*, return receipt requested on this same day to County Judge Ed Emmett and County Attorney Vince Ryan, respectively, also meeting the post-suit notice requirements of Local Government Code §89.0041(a).


                        ____/s/__Jacqueline A. Armstrong _____
                               Jacqueline A. Armstrong


*PLAINTIFFS' ORIGINAL COMPLAINT*                                                    *PAGE 20*